IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SHIELD TECHNOLOGIES CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SHIELD ACQUISITION GROUP, LLC | ) |
| | ) |
| Defendant. | ) |

**COMPLAINT**

Plaintiff, Shield Technologies Corporation ("Shield"), by and through its attorneys, K&L Gates LLP, hereby states as follows for its Complaint against Defendant Shield Acquisition Group, LLC ("SAG"):

**INTRODUCTION**

1. Ninety percent (90%) of Shield's business is devoted to supporting the United States military currently engaged in two foreign wars. The other ten percent (10%) of Shield's business supports international defense and domestic oil and gas. Shield designs, manufactures and supplies highly engineered protective covers used by several branches of the United States military. Shield's patented technology reduces corrosion, increases readiness and extends the life cycle for covers which protect the military's key assets that are vital components of war, including its weapons and artillery. Shield has a contract to supply *all* of one branch's needs for protective covers this year, a branch under order to cover all its weapons by year-end. According to Rear Admiral James D. McManamon, "We are in the process of outfitting every surface ship in the Navy with [Shield] covers. . . . This should be completed by the end of [fiscal 2011]." Topside Cover-Ups, *Seapower* (May 2010) (Exhibit A hereto) (emphasis added). Over the past three years, operating income of Shield has increased 900% based on projections for year-end

2011. Now, based on unarticulated "concerns," a few members of Defendant SAG, a non-operating investment LLC, are attempting to seize control of Shield with one of the first orders of business to fire the United States Navy senior retired officer who maintains the Shield sales contacts. Such actions are certain to disrupt if not completely destroy Shield with the potential to vitiate Shield's government supply contracts, and jeopardize its technology license as well as sales. SAG also appears to take these actions in defiance of its Owners' rights as well as its operative documents, exposing Shield to potential federal securities fraud charges in the process. Confronted with these circumstances as well as threats and conflicting directions from the Owners of SAG, Shield seeks declaratory relief from this Court.

## THE PARTIES

2. Plaintiff, Shield, is a Delaware Corporation with its principal place of business at 181 West Madison Street, Suite 4700, Chicago, Illinois 60602.

3. Defendant, SAG, is a Delaware Limited Liability Company with its principal place of business, on information and belief, at 13769 Main Street, Lemont Illinois 60439. On information and belief, the vast majority of SAG's Owners are residents of and domiciled in Illinois.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa and pursuant to 28 U.S.C. § 1331 because this action arises under the federal securities laws. The Court also has supplemental subject matter jurisdiction over certain claims pursuant to 28 U.S.C. § 1367.

5. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendant resides in this District and a substantial part of the events and omissions giving rise to the claims herein arose in this District.

6. Venue is further acceptable to Defendant in this District as its Limited Liability Company Agreement provides, in part, "[t]he Members irrevocably agree that all actions or proceedings in any way, manner or respect, arising out of or from or related to this Agreement must be litigated only in courts having situs within Chicago, Illinois."

## FACTS

7. The United States General Accounting Office has estimated the cost of corrosion to the United States military is $20 billion and represents the largest controllable cost incurred by the United States Department of Defense ("DOD"). Every branch of the military has a corrosion control office.

8. Shield manufactures and sells, under the trade names "Envelop" or "Envelop Protective Covers", patented four-layer protective covers that resist and reduce both corrosion and environmental degradation by up to ninety percent (90%). Shield's covers protect the assets of the United States military including its artillery, weapons, helicopters, tanks, ship-borne assets and other articles of war and equipment. Shield's products can be viewed on its website at http://www.envelopcovers.com/about-shield-technologies-corp.htm.

9. The DOD is the largest and most important customer of Shield. The change of control sought by Defendant here will jeopardize Shield's relationship with the DOD -- virtually all of Shield's sales -- and could adversely impact its license to use the patented technology contained in the covers.

10. The covers were developed under a United States Navy Small Business Innovative Research Grant ("SBIR"). Under the SBIR the Navy retains the right to manufacture the covers on a royalty-free basis.

11. Because they are used to protect weapons, Shield's covers are considered "defense articles" under the International Traffic in Arms Regulations. 22 C.F.R. § 120.6. The

exportation of such articles to foreign countries is highly regulated. Any party seeking to export such articles must first register with the Department of State's Directorate of Defense Trade Controls ("Department of State") (22 C.F.R. § 122.1(a)) and then obtain an export license for each sale to a foreign party (22 C.F.R. § 123(a)). The Department of State closely monitors the control of entities involved in the manufacture and export of defense articles, with strict reporting requirements when there is a change in management. 22 C.F.R. § 122.4.

12. Samuel W. Sax, a United States Navy senior retired officer (hereinafter "Sax") and others including his son, Thomas Sax, formed Shield to purchase the license to manufacture the patented envelop covers. The exclusive license is for the life of the patents world-wide. In the past three years, in a difficult economic environment with the DOD facing massive budget cuts, Shield's operating income has increased 900% based on projections for year-end 2011.

13. Defendant SAG is an investment Limited Liability Company with no employees and no experience supplying the DOD. SAG is not an operating company.

14. To solicit investors in its securities, SAG distributed an offering document dated June 9, 2010. The SAG Offering Document contained the following representations:

> SAG was formed to . . . hold the Notes and/or Shares acquired for the collective benefit of the investors in SAG (p. 1).
>
> \*   \*   \*
>
> The Managers [of SAG] as such will have minimal ability to control Shield on a day-to-day basis (p. 8).
>
> \*   \*   \*
>
> SAG will not have control over the actions or business of Shield on a day-to-day basis and thus will have limited influence over Shield's ability to succeed. . . . . (p. 9).

(A true and correct copy of that SAG Offering Document is attached hereto as Exhibit B).

15. Among the investors in SAG are three family trusts of the Donnelly family (the "Donnelly Trusts"). The Donnelly Trusts are the single largest Owners of SAG with a combined 16.67% stake. The James R. Donnelly Trust is the largest single individual stakeholder at 10%. By agreement between SAG and other Shield shareholders, James R. Donnelly was named to the Board of Directors of Shield in 2010. He remains a Board Member today.

**General Electric Pension Trust Convertible**
**Promissory Notes and Shield's Credit Line**

16. In November of 2004, Shield entered into a Note Purchase Agreement pursuant to which General Electric Pension Trust, a passive investment trust, agreed to loan Shield money which debt was evidenced by a convertible promissory note. The General Electric Pension Trust was not an operating company.

17. During the financial market crisis that began in 2008, Shield was told by its then-senior lender, Associated Bank, that its credit line would not be renewed. After discussions with numerous banks, only Delaware Place Bank agreed to issue Shield a new line of credit. Securing and maintaining its credit line has been and remains a prime objective of Shield and its management.

18. In August 2009, the relationship between General Electric Pension Trust and Shield was revised. The revised debt was evidenced by two "Amended and Restated Senior Secured Convertible Promissory Notes" in the amounts of $300,000 and $1,250,000 respectively (the "Promissory Notes"). (True and correct copies of the Promissory Notes are attached hereto as Exhibits C and D). Both Promissory Notes paid interest at the rate of 10.5% per year and could be converted for securities in Shield, though General Electric Pension Trust and its co-lender, another non-operating passive investment vehicle, Counterpoint Venture Fund, LP ("Counterpoint"), had no designs on operating Shield.

19. The General Electric Pension Promissory Note was in the amount of $1,250,000 and the Counterpoint Promissory Note was in the amount of $300,000.

20. At the time the parties signed the Promissory Notes, Shield, General Electric Pension Trust, GE Asset Management, Inc. and Counterpoint along with Shield's senior lender entered into a "Subordination Agreement." Pursuant to that Subordination Agreement, the creditor positions of General Electric and Counterpoint were subordinated to that of Shield's senior lender. A legend affixed to the face of the first page of the Promissory Notes indicates that "ALL INDEBTEDNESS EVIDENCED BY THIS NOTE IS SUBORDINATED."

21. After SAG was formed in 2010, it acquired the Promissory Notes, though the Promissory Notes were in no way amended or revised to reflect that acquisition.

22. The SAG Offering Memorandum acknowledged the priority of Shield's senior lender and that lender's credit line: "*Junior Security Interest of Holders of Notes; Senior Lender.* The Notes are secured by a junior lien on all Shield's assets. Delaware Place Bank ("DPB") is the senior lender to Shield." SAG Offering Memorandum, Exhibit B at p. 4.

**Shield Pays Off The Promissory Notes and the Attempted August Conversion**

23. Shield began the annual process of renewing its credit line with its senior lender in the second quarter of 2011. These negotiations commenced at a time when the credit markets were precarious, and the DOD was facing significant budgeting cuts.

24. In an effort to improve its borrowing capacity as well as present to the DOD ultimate financial strength for the purpose of the DOD contracting process, Shield set out to clear all debt from its balance sheet.

25. In August of 2011, the largest red flag on the Shield balance sheet was the Promissory Notes payable to SAG at the interest rate of 10.5%, an interest rate far out of line with the prevailing market borrowing rates.

26. Management determined it was in the best interests of Shield, including, among other things, from a borrowing and balance sheet perspective as well as the high attendant interest rate and uncertain business outlook for Shield in 2012, to pay off the Promissory Notes. In consultation with its senior lender and with its consent, management decided to pay off the Promissory Notes.

27. On August 31, 2011, Shield, by wire money transfer, paid off the Promissory Notes in full with interest through November 17, 2011. SAG received and still possesses those pay-off proceeds today.

28. Before Shield paid off the Promissory Notes, at a dinner on or about August 8, 2011, Mike Weible (one of two Managers of the SAG LLC) accompanied by a SAG Owner Chuck Saporito hand-delivered to Thomas Sax a letter purporting to partially convert "into shares of [Shield] common stock", the General Electric Pension Trust Promissory Note and the Counterpoint Promissory Note. (A true and correct copy of the August 8, 2011 letter is attached hereto as Exhibit E.)

29. Both Promissory Notes impose the following mandatory obligations on Shield and SAG in the event of an attempted exchange of those Notes for Shield securities:

> The Company will comply with all federal and state securities laws regulating the offer and delivery of [Shield] Common Stock upon conversion of this [Restated] Note, if any. The Holder [SAG] shall also comply with all federal and state securities laws with respect to its conversion of this [Restated] Note.

(Exhibits C and D hereto, ¶ 1(e)).

30. On or about August 20, 2011, Shield management was informed the August 8th request for conversion had neither been considered nor approved by the SAG Owners and that there had been no notice of any kind to the SAG Owners about Mr. Weible's August 8th letter seeking to acquire the Shield securities.

31. In an August 22, 2011 letter, an officer of Shield inquired as to whether the SAG Managers had complied with their legal obligations including whether the SAG Owners had approved the August 8th letter. In addition, the Shield officer asked whether "the Managers have a legal opinion from a major law firm that federal and state securities laws have been complied with." (A true and correct copy of the August 22, 2011 letter is attached hereto as Exhibit F).

32. The SAG Managers never supplied the information requested in the August 22nd letter. Instead, in an August 25, 2011 letter, Mr. Weible represented the following:

> Regarding our internal governance procedures be assured that we took steps in connection with the conversion of the [Shield] notes in accordance with the provisions of the applicable documents and with the advice of our counsel. We are under no obligation to [Shield] to provide any supporting documentation.

(A true and correct copy of the August 25, 2011 letter is attached hereto as Exhibit G).

33. After 10:00 PM on Sunday September 11, 2011, when SAG knew two of Shield's officers were in London on important Shield business, counsel for SAG (Collins & Collins) faxed a threatening letter to Sax and Thomas Sax. Among other things, it "**DIRECTED**" them "**TO IMMEDIATELY . . . DELIVER TO SHIELD ACQUISITION GROUP LLC A CERTIFICATE EVIDENCING THE 1151 SHARES OF COMMON STOCK IN SHIELD** . . . by the close of business on Monday, September 12, 2011", 19 hours later. (Emphasis in original). The letter then stated:

> **YOU ARE HEREBY ADVISED THAT YOUR FAILURE TO TAKE THE IMMEDIATE ACTION DEMANDED HEREIN SHALL CONSTITUTE WILLFUL MISCONDUCT IN THE DISCHARGE OF YOUR DUTIES TO THE COMPANY WHICH CONSTITUTES GROUNDS FOR "*FOR CAUSE*" TERMINATION OF YOUR EMPLOYMENT AND COMPENSATION**

(Emphasis in original).

34. On Tuesday, September 13, 2011, Shield Management received a letter from James R. Donnelly. In that letter, Mr. Donnelly informed Shield management as follows:

> It has come to our attention that two Managers of SAG, Mike Weible and Mark Sniegowski ("Two Managers"), have attempted to transfer promissory notes payable to SAG in order to purchase or acquire shares in Shield Technology Corp. ("Shield"). Please be advised that as a member of SAG, we have received no formal notice of these actions and that the Two Managers have not given notice to the SAG Members of any meeting to either consider or vote on such action as is required by Section 7.3 of the Limited Liability Company Agreement of SAG. In addition, we do not in any way consent to, authorize or support any such action either by the Two Managers or SAG. In fact, we directly oppose the action and do not authorize the Two Managers to any way vote or exercise control over any shares in Shield due us.

(A true and correct copy of Mr. Donnelly's September 13, 2011 letter is attached hereto as Exhibit H).

35. Mr. Donnelly also stated the actions by the SAG Managers were not in the interests of Shield:

> Perhaps most distressing, the actions of the Two Managers are harmful to both the interests of SAG and the shareholders of Shield. Shield is a company that has become a lot more profitable in the past several months, but it is at its essence a sales organization entirely dependent on the personal relationships of certain of its employees with the government purchasers that drive the business. Without the customer contacts, Shield is nothing. It would be a <u>disaster</u> if anything should happen to any of Shield's key contacts with our key customers. There is no doubt in my mind that the actions of the Two Managers are putting those critical relationships at risk, thereby jeopardizing the one shared interest we all have: the long-term financial success of Shield. In that case, nobody wins!

(Exhibit H) (Emphasis in original).

36. The actions of SAG attempting to acquire Shield could have serious consequences. Pursuant to 42 U.S.C.S. § 6305, "[t]he party to whom the Federal Government gives a contract or order may not transfer the contract or order, or any interest in the contract or

order, to another party. A purported transfer in violation of this subsection annuls the contract or order so far as the Federal Government is concerned . . . ."

37. If the Federal Government invokes this statute, although it may recognize SAG as the successor in interest to a Government contract "when in its interest," the Federal Government is not compelled to do so. 48 C.F.R. § 42.1204.

38. In addition, an acquisition resulting in a change of control of Shield management to SAG may put into jeopardy Shield's license to use the patented technology needed to manufacture its covers.

39. Mr. Donnelly requested that Shield issue no securities to SAG or its Managers:

> On behalf of the uninformed Members of SAG (and shareholders of Shield), please don't issue any shares to the Two Managers or SAG. I have no idea what the Two Managers are doing. If other SAG members are "in" on it, that raises even more problems within SAG and the Two Managers, especially in transactions like these where the acquisition of securities is involved.
>
> If and when shares are issued, my brothers and I, for estate reasons, wish the shares be listed in the name of our Trust at The Northern Trust Company.

(Exhibit H). Mr. Donnelly copied all of the SAG Owners on his letter.

40. The next day, September 14, 2011, counsel for Shield (K&L Gates) wrote counsel for SAG. Among other things, that letter requested: (a) proof that the actions of Mike Weible had been duly considered and approved by the SAG Owners; and (b) evidence that adequate written disclosures were made to the SAG Owners in advance to allow them to make an informed investment decision as to the purchase of Shield securities.

41. On September 16, 2011, counsel for SAG responded and represented the following:

> SAG had fully complied with all applicable agreements in converting a portion of the Notes into 1151 shares of common stock of Shield.

> \* \* \*
>
> Shield in fact does have evidence that SAG has properly exercised its option to convert a portion of the Notes to common stock of Shield.
>
> \* \* \*
>
> [M]ore than 83% of SAG's investors have approved of SAG's conversion of a portion of the Notes into 1151 shares of common stock in Shield. In other words, every SAG investor other than Mr. Donnelly and his family have approved of the conversion.

The September 16th letter enclosed no documentation supporting the above statements. (A true and correct copy the September 16, 2011 letter is attached hereto as Exhibit I).

42. Counsel for SAG also took the position the federal securities laws had no application to the acquisition of Shield securities. From this opinion, Shield deduced SAG had not disclosed all material facts to its Owners at any point up to the Sunday, September 11th letter.

43. In the past weeks, Shield management has been informed that in addition to the Donnelly family, at least two other SAG Owners owning more than 2.5% of SAG knew nothing about Mr. Weible's conversion efforts prior to September 13, 2011 and had not approved them. This made the "83% approval" representation impossible.

44. On September 22, 2011, counsel for Mr. Donnelly (Mayer Brown) wrote counsel for SAG, stating the following:

> Our view is that the consent of **all** of the members is required in connection with the conversion that has purported to have taken place. Neither Mr. Donnelley nor his brothers, Robert and David, have provided such consent or been asked to grant such consent. We do not believe that there is any misunderstanding by SAG on that fact.
>
> \* \* \*
>
> Your analysis also conveniently skips over the language in the second sentence of 3(b) of the Agreement that states that the Units in SAG owned by Mr. Donnelly "represent an interest in the Shares and/or Notes (if any) acquired by the Company and interests therein will be allocated and assigned to the Members in accordance with their respective Capital

> Contributions." Such a clear allocation and assignment of interests to Mr. Donnelly (and to the other members of SAG) supports the construction that Section 5.2(a) that the Managers are not free to do as they please with the members' interests in the Notes.
>
>       *      *      *
>
> Your letter claims that 83% of the Members have consented to the conversion. It is not clear to us why such consent was solicited if it was not required or why the consent of Mr. Donnelly and his brothers was not solicited by SAG. Mr. Donnelly knows of other members whose consent was also not given and is skeptical that consent from 83% of the members has been obtained.

(A true and correct copy of the letter of September 22, 2011 is attached hereto as Exhibit J.)

**SAG Attempts To Seize Shield By Force**

  45.  Rather than seek legal redress from a court of law for what it claims is a breach of contract, SAG chose vigilante justice. Purportedly on September 14, 2011, SAG Managers by telephone claim to have reconstituted the Board of Shield without any notice to either the SAG Owners or the shareholders of Shield, much less a Shield shareholders' meeting. (A true and correct copy of a SAG notice dated September 20, 2011 is attached hereto as Exhibit K).

  46.  Although the September 20, 2011 notice advises the SAG Owners that "no further action is needed with respect to these actions", it asks the SAG Owners to "execute the attached sheet and return it to SAG Manager, Mark Sniegowski, using the enclosed envelope" purportedly "for the sake of clarity and so that there is a clear written record." (Exhibit K).

  47.  The "attached sheet" purports to solicit retroactively a "vote" that should have occurred more than six weeks earlier. "I, _____, an investor in and Member of Shield Acquisition Group LLC ("SAG"), hereby consent, approve, ratify and affirmative [sic] vote in favor of the following actions," with the actions being events that all occurred in the past and for which the SAG investors were told "no further action is needed." (Exhibit K).

  48.  The attached sheet goes on to recite that

> **I acknowledge and agree . . . I have received written notice from the Managers of SAG soliciting my consent, approval or [sic] affirmative vote and that if I have not expressly denied my consent, approval or [sic] affirmative vote to SAG Manager, Mark Sniegowski, within 15 days of this notice, then . . . I shall be considered to have irrevocably given my consent, approval and affirmative vote to the matters set forth above.**

(Exhibit K) (Emphasis in original).

49. The September 21, 2011 cover memorandum which accompanied the September 20th SAG Investor Notice describes the "affirmative vote" document described above as a "consent form." It also commands the SAG Owners to sign it: "**A consent form that you must fill out, sign and date and return to SAG in the self-addressed stamped envelop[e]**." (Underline emphasis supplied). The "consent form" provides no option other than an affirmative vote yes in favor of the Managers' proposal. (A true and correct copy of that memorandum and its two page attachment dated September 12, 2011, are attached hereto as Exhibit L).

50. The September 21st memo contains a two-page attachment bearing the date "September 12, 2011." The attachment to "SAG Investors" begins as follows: "First, we are pleased to report that Shield has enjoyed record growth in sales and profitability through mid-year. However, as you'll read below, we have concerns about some members of Shield's management and its direction going forward so that these results are sustained and form a basis for the company's organic growth." (Exhibit L.)

51. But the attachment dated September 12th articulates no "concerns" other than that Shield paid off the Promissory Notes in full. According to the attachment, the repayment of that Shield debt "confirmed our suspicions that certain Shield officers and certain existing shareholders had – and continue to have – the desire to run the enterprise for their own personal

gain and not for the benefit of the shareholders." (Exhibit L). The attachment provides no other details about the stated concerns and suspicions.

52. The existence of these documents (Exhibits K and L) confirmed the concerns of Shield that the purported August 8th letter was not authorized by the SAG Owners. Those documents also heightened the concern of Shield that no informed investment decision was or could be made by SAG Owners and that such a decision might be solicited by the SAG Managers in a manner inconsistent with federal securities laws.

**The Misstatements and Omissions in the Purchase of Shield Securities**

53. The potential omissions and misstatements surrounding the effort to solicit SAG Owner approval and/or to cause Shield to issue securities include, but are not limited to:

> SAG Owners had notice of the purchase of Shield securities before the date SAG claims the purchase occurred, August 8, 2011;
>
> SAG Owners approved the purchase of Shield securities before the date SAG claims the purchase occurred, August 8, 2011;
>
> by September 16, 2011, more than 83% of SAG's investors have approved of SAG's exchange of a portion of the Notes for Shield securities;
>
> by September 16, 2011, every SAG investor other than Mr. Donnelly and his family had approved the conversion;
>
> the "concerns" SAG Managers supposedly have over the current management at Shield;
>
> the potential consequences to Shield's contracts, contacts and business resulting from its acquisition by SAG;
>
> the current or historical financial statements of Shield;
>
> the risks to future operation as seen by Shield's current management;
>
> the business prospects for Shield in the current environment;
>
> SAG's plan or strategy for operating Shield after acquisition; and
>
> the impact of firing a United States Navy senior retired officer will have on Shield's future business with the Navy.

54. Shield is confronted with conflicting requests from SAG Owners as to whether to issue Shield securities and to whom those securities should be issued. Shield also questions whether any issuance has been properly authorized as well as the legality of the recent solicitation for a retroactive SAG vote. Issuing securities in light of these circumstances and all the known irregularities creates serious risks to Shield, its officers and its directors.

## COUNT I
### Declaratory Judgment, 28 U.S.C. § 2201

55. Shield reincorporates and re-alleges Paragraphs 1-54 of the Complaint as though fully set forth herein.

56. Shield is obliged to comply with all federal securities laws regulating the offer and delivery of Shield securities in connection with any conversion of the Promissory Notes.

57. There exists an actual controversy between Shield and SAG regarding whether the attempted acquisition of Shield securities would operate as the purchase and/or sale of a security under, and subject to, the federal securities laws including but not limited to antifraud provisions including section 10(b) of the 1934 Securities Exchange Act and interpretive Rule 10b-5 (15 U.S.C. § 78j(b), 17 C.F.R. § 240.10b-5).

58. Shield believes the exchange of the debt evidenced by the Promissory Notes for the Shield securities would constitute a purchase and/or sale of securities subject to federal securities laws including but not limited to the antifraud provisions, while SAG has taken the opposite position. Further, there exists an actual controversy as to the obligations to disclose, and not omit or misrepresent, material facts, to the SAG Owners prior to the time they make any investment decision with respect to the Shield securities.

59. A declaratory judgment will terminate the controversy and clarify the respective rights and obligations of the parties with respect to the disposition of the Shield securities.

## COUNT II
### Declaratory Judgment, 28 U.S.C. § 2201

60. Shield reincorporates and re-alleges Paragraphs 1-54 of the Complaint as though fully set forth herein.

61. There exists an actual controversy between Shield and SAG regarding whether the August 8, 2011 letter of Mike Weible seeking to exchange the debt evidenced by the Promissory Notes for Shield securities was fatally defective because, among other things: (a) SAG failed to attain the necessary authorization of its Owners to exchange the Promissory Notes; (b) SAG failed to disclose all material facts and/or misrepresented material facts to SAG Owners in connection with that August 8th letter; (c) whether SAG accomplished any conversion before the Promissory Notes were extinguished; or (d) that SAG's material breaches of the Promissory Notes, including its duty to comply with all federal and state securities laws, render SAG incapable of now enforcing any conversion rights it may have had.

62. A declaratory judgment will terminate the controversy and clarify the respective rights and obligations of the parties with respect to the propriety of the August 8th letter and whether the Promissory Notes were or could have been exchanged for Shield securities, and whether SAG has any right to convert the Promissory Notes into common stock of Shield due to its actions and the other events.

## COUNT III
### Declaratory Judgment, 28 U.S.C. § 2201

63. Shield reincorporates and re-alleges Paragraphs 1-54 of the Complaint as though fully set forth herein.

64. There exists an actual controversy between Shield and Defendant SAG regarding whether Shield's full payment of the principal and all accrued and un-accrued interest through November 17, 2011 on the Promissory Notes, has fully satisfied and extinguished the Promissory

Notes and any and all rights that may have been contained therein, including any right to conversion.

65. A declaratory judgment will terminate the controversy and clarify the respective rights and obligations of the parties under the Promissory Notes.

**PRAYER FOR RELIEF**

WHEREFORE, Shield Technologies prays for the following relief:

1. On the first cause of action, for a declaration (a) that SAG's attempt to acquire Shield securities by exchanging the debt evidence by the Promissory Notes was a purchase and/or sale of securities to which the federal securities laws applied, including the antifraud provision of the Federal securities laws; (b) the transaction necessitated full prior disclosure of all material facts and prohibited any omission or misstatement of material facts; (c) no such disclosure occurred; and (d) for such other and further relief as this Court deems proper;

2. On the second cause of action, for a declaration that (a) SAG lacked authority to request a conversion of the debt evidenced by the Promissory Notes for Shield securities; (b) SAG did not exercise, and cannot exercise, any rights of conversion under the Promissory Notes absent the necessary consents and/or approvals; (c) SAG has lost or forfeited any right it may have had to convert the Promissory Notes in exchange for Shield securities as a consequence of its breaches of the terms of the Promissory Notes; (d) the Promissory Notes, to the extent they are not extinguished and/or void, be rescinded; (e) SAG return to Shield the Promissory Notes; and (f) for such other and further relief as this Court deems proper;

3. On the third cause of action, for a declaration (a) Shield's full payment of amounts owing under the Promissory Notes and un-accrued thereunder through November 17, 2011 fully extinguished the Promissory Notes such that among other things the holder thereof has no further rights, including but not limited to any right to exchange the Promissory Notes for

securities of Shield; (b) rescinding the Promissory Notes to the extent they are not extinguished and/or void; and (c) for such other and further relief as this Court deems proper; and

4.　　For costs of suit according to proof.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims that are properly tried to a jury.

Dated: October 6, 2011

                                                Respectfully Submitted,

                                                **SHIELD TECHNOLOGIES CORPORATION**

                                                By: /s/ Peter G. Rush _____
                                                    One of Its Attorneys

Peter G. Rush
Jeffrey T. Petersen
Sara E. Fletcher
K&L GATES LLP
70 West Madison Street, Suite 3100
Chicago, Illinois 60602
312-372-1121
Attorney No.: 45515