# EXHIBIT B

## SHIELD ACQUISITION GROUP, LLC
70 to 130 Limited Liability Company Units ("Units")
at $25,000 each (or from $1,750,000 to $3,250,000 in Total
Minimum Purchase per Investor $25,000 (1 Unit)
June 9, 2010

| | |
|---|---|
| Issuer: | Shield Acquisition Group, LLC, a recently formed manager-managed Delaware limited liability company (the "Company" or "SAG"). |
| Manager: | The initial managers of SAG shall be Thomas F. Sax, William ("Mike") Weible and Mark Sniegowski, all individual residents of the State of Illinois. The principal office and phone number of SAG and the Managers are: 181 West Madison Street, Suite 3900, Chicago, Illinois. Telephone: (312) 327-3179. |
| Offering: | Not less than 70 and not more than 130 units ("Units"). Each Unit is $25,000. If a Manager purchases Units, the purchase will be made on the same terms and conditions as offered to any other investor. The Managers and/or their respective affiliates may, but have not committed to, purchase any unsold Units as of the closing of the offering. |
| Minimum Purchase: | $25,000 (1 Unit). In their discretion the Managers may sell fractions of Units to otherwise qualified investors. |
| Business of SAG: | SAG was formed to (1) raise capital for one or both of the following purposes: (a) acquire the convertible notes in the aggregate principal amount of $1,550,000 made by Shield Technologies Corporation, a Delaware corporation ("Shield"), in favor of (i) General Electric Pension Trust, a common law trust formed under the laws of the State of New York, in the principal amount of $1,250,000 (the "GEPT Note") and (ii) Counterpoint Ventures Fund LP, a Delaware limited partnership, in the principal amount of $300,000 (the "Counterpoint Note" and together with the GEPT Note, the "Notes"); (b) acquire shares of common stock of Shield (the "Shares") from one or more current Shield stockholders other than those held by or for the benefit of members of the Sax family, which Shares may represent up to approximately 52% of Shield prior to conversion of the Notes provided such stockholders and SAG can come to an agreement on price and terms and (2) hold the Notes and/or Shares acquired for the collective benefit of the investors in SAG. Through SAG investors will own, indirectly, their pro rata share of the Notes and/or Shares, if any, that SAG acquires. |

Business of Shield:

Shield is in the business of manufacturing and selling corrosion inhibiting protective covers primarily for use by the United States military, non-U.S. militaries and private industry. Shield's protective covers are assembled by two Shield-qualified sewing providers according to Shield's standards and specifications. The sewing providers are Aerospace Fabrication and Materials in Lakeville, Minnesota, and MarMac located in McBee, South Carolina. Shield is in the process of qualifying a third sewing provider. Virtually all covers are made to the order and specification of a particular customer and for a particular use. The covers are manufactured, marketed and sold pursuant to an intellectual property license to Shield by Creare, Inc., of Hanover, New Hampshire ("Creare"). Shield maintains an office in Eagan, Minnesota in addition to Chicago, Illinois. Shield's most recent audited financial statements are attached hereto as Exhibit A.

The intellectual property license relates to certain patents and trademark rights of Creare. Shield also has a servicing agreement with Creare pursuant to which it provides technical support to Shield related to the licensed intellectual property. The license is a personal, non-transferable royalty-bearing worldwide license to certain patents and a trademark (Envelop). Shield does not have the right to sublicense under the license. Under the license the royalty payable by Shield is 5% of the net selling price on the sale of each licensed product sold by Shield and shall be payable until the last of the applicable patent rights expire, determined on a country-by-country basis. To the extent sales exceed $10 million in any calendar year the royalty payable on all sales during the balance of such calendar year shall be 1%. The term of the licenses extends until the last of the licensed patents expire. The license may be terminated by Creare following specified events of default. Please refer to the copy of the license attached as Exhibit B for more particulars of the license terms.

Use of Proceeds:

SAG intends to use the proceeds of the offering (from a minimum of $1.75 million to a maximum of $3.25 million) to (i) acquire the Notes and/or Shares; (ii) pay for the legal and other formation costs in connection with the preparation of this offering; and (iii) legal and other costs associated with the negotiation and/or closing of one or the other or both of the transactions contemplated hereby.

There can be no assurance that even if the minimum amount is raised in the offering that SAG will be successful in acquiring any Notes or Shares. Even if not successful SAG will incur costs which will result in investors being responsible for their pro rata portion of the fees and costs incurred in forming SAG, preparing

the offering and attempting to acquiring the Notes and/or Shares. Thus even if the negotiation to acquire Notes and/or Shares is not successful, investors will not receive a full refund of their subscription amount. If more funds are raised than are needed to pay expenses and/or acquire Notes and/or Shares, investors whose subscriptions are accepted will be cut back pro rata in the discretion of the Managers, whose decision on such matters shall be final. The offering and transactional expenses are estimated to be but may exceed $75,000.

Depending upon the negotiated sale price of the Notes and/or Shares and the number of Shares acquired, if any, the Managers anticipate that if the minimum offering amount is raised that amount will be used first to pay SAG's costs, then to acquire the Notes and/or the Shares. The acquisition of the Notes and/or the Shares, if any, may not occur in any particular order and may not occur at the same time. As noted above, SAG has incurred fees and costs and will incur additional fees and costs regardless of whether it is successful in acquiring Notes and/or Shares. In any event investors will be responsible for payment of the costs incurred.

Terms of Notes:         The Notes, the form of which is attached hereto as <u>Exhibit C</u>, bear interest at 10.5% and are convertible into shares of common stock of Shield on a fully diluted basis as of the date(s) of conversion. Shield may require that the Notes be converted into shares of Shield common stock in connection with or following an initial public offering by Shield meeting specific criteria. See <u>Exhibits D</u> and <u>E</u>, Note Purchase Agreement and first amendment thereto. Interest accrues on the Notes quarterly and Shield has the option to pay interest on the Notes annually on or before each December 31 and prior to the date on which the Notes may be called or mature. Since the Notes were issued Shield has paid the accrued interest to the holders of the Notes annually each December. The principal amount of the Notes may not be repaid prior to November 17, 2011. As of March 31, 2010 the accrued and unpaid interest on the Notes was approximately $40,687.50.

*Maturity Date.* The Notes are due to be repaid on November 17, 2014. As of November 17, 2011 the Notes become demand notes, meaning that the holders can demand that Shield repay them pursuant to the terms of the Notes.

*Note Conversion Feature.* The Notes are convertible by the holders at any time, subject to Delaware Place Bank's consent (see below) Following the date the Notes become demand notes, the

holder of the GEPT Note is entitled to 10 days' notice of Shield's intent to repay the GEPT Note, which provides such holder with the ability to convert rather than receive repayment. It is the Managers' intention that as a condition to SAG acquiring the Counterpoint Note that a right to a notice of conversion like that described in the preceding sentence with respect to the GEPT Note will become a term of the Counterpoint Note. Mr. Thomas F. Sax, a shareholder of Shield, and Mr. Samuel Wm. Sax, a stockholder (indirectly) and a board member of Shield, have agreed that in those capacities they will support Shield agreeing to that change in the terms of the Counterpoint Note.

The Notes are convertible according to the following formula: For each $250,000 of principal and accrued but unpaid interest outstanding from time to time (and any pro rata portion thereof) the Notes are convertible into 2.5% of Shield on a fully diluted basis as of the date of conversion. In addition, as a result of the $1,750,000 of Unfunded Commitment under the GEPT Note as of March 31, for each $250,000 of the Unfunded Commitment the holder of the GEPT Note is entitled to convert such amount into shares representing 1.25% of Shield on a fully diluted basis as of the date of conversion. See Exhibit F for an example of the conversion of the Notes into shares.

*Junior Security Interest of Holders of Notes; Senior Lender.* The Notes are secured by a junior lien on all of Shield's assets. Delaware Place Bank ("DPB") is the senior lender to Shield. DPB made a revolving loan to Shield in the maximum principal amount of $1.5 million in August 2009. The outstanding amount of the loan was approximately $1,041,135 as of May 28, 2010. The loan bears interest at prime plus 100 basis points but not less than 6.5% per annum and requires monthly payments of interest; the principal and any outstanding interest is due at maturity. The loan is scheduled to mature on August 17, 2010. Shield's ability to access the facility is based upon a borrowing base formula. The facility also provides Shield with the ability to obtain letters of credit. In addition to a senior lien on Shield's assets Shield has pledged $300,000 in cash to DPB which cash is held in an account at DPB and has agreed to maintain an average daily balance of not less than $75,000 in Shield's demand account at DPB. To SAG's knowledge, Shield is current on its payments on the DPB loan. Shield has been in technical default on certain financial covenants but has received a formal written waiver of such defaults from DPB. The bank's lien priority is capped at $2.0 million. The bank's consent is required in connection with any conversion of the Notes.

*Rights as a Note holder.* As the holder of the Notes SAG will succeed to the rights of the original holders of the Notes as set forth in the Note Purchase and Investor Rights Agreements attached hereto as <u>Exhibits D, E</u> and <u>G</u>.

Under the Note Purchase Agreement, the holders of the Notes are the beneficiaries of certain representations and warranties and are entitled to certain information from Shield. Once the Notes become demand notes (November 17, 2011) Shield may repay the Notes at any time, provided that Shield must give the holder of the GEPT Note ten days' notice of its intent to repay, allowing such holder the ability to convert the GEPT Note prior to repayment.

The Investor Rights Agreement entered as of the date of the original Note Purchase Agreement provides that on and after November 17, 2008 holders of the Notes have the right to put Shield shares obtained upon conversion of the Notes to Shield at an agreed upon value or a value established by an independent appraisal. If that repurchase by Shield is not fulfilled within 30 days of the request of the holders of at least 40% of shares such holders may demand that the shares be registered for public sale. The agreement also provides piggyback (when another registration rights holder exercises his or its rights to register the holders of piggyback rights can also register subject to certain limitations) and short form registration rights. A short form registration is an additional right to get the Shares registered. Following Shield's IPO (if ever) Shield could at some point thereafter be eligible to register its shares using a From S-3. Form S-3 allows a registrant to incorporate much of the prospectus and exhibit information by reference to other filings and thus is a less expensive way to provide registration rights when a registrant is eligible to use it.

As a Note holder SAG shall have preemptive rights with respect to future non-public share issuances by Shield as well as drag along (the right to compel other owners of Shield shares to sell to a third party when SAG sells) and co-sale rights (the right to sell when other holders of Shield Shares sell), rights of first refusal with respect to the proposed transfer by Shield stockholders of their shares.

To the extent SAG acquires shares of Shield by conversion of the Notes any proposed transfer of such shares shall be subject to a right of first refusal by Shield as set forth in the Investor Rights Agreement. The shares for which the Notes may be converted are subject to certain restrictions on transfer.

For so long as at least $250,000 in principal amount of the Notes is outstanding, then under the Investor Rights Agreement the holders of at least $125,000 in principal amount of the Notes shall have the right to approve with respect to Shield:

- Changes to certificate of incorporation and by-laws
- Dividend declaration and payments
- Repurchase of equity securities owned by employees at termination and payment of indebtedness (other than the Notes) prior to stated maturity
- A merger or consolidation or sale of all or substantially all of its assets
- An acquisition or series of acquisitions aggregating more than $3 million
- Liquidation, recapitalization or reorganization or creating any subsidiary
- Borrowing more than $1 million
- Change in size of board
- Election, appointment or removal of Shield's CEO, CFO, COO or president.

*Rights as a Stockholder.*  Even if the Shares acquired by SAG represent a majority of Shield's outstanding shares prior to any Note conversion or repayment, the voting power with respect to a majority of the Shield shares outstanding (approximately 55.91% in the aggregate), including some of the Shares, is held by Thomas F. Sax pursuant to his individual share ownership (approximately 12.82%) in place voting agreements (proxies) (approximately 28.09%) and as a result of various family relationships (approximately 15%).  The voting agreements are in effect until such time as either all the Notes are repaid or the GEPT Note is repaid or converted into shares.

A transfer of certain of the Shares that SAG may acquire is subject to rights of first refusal, first by Shield, then by the founding stockholders and then by all of the stockholders.  Messrs. Thomas F. Sax and Samuel Wm. Sax in their capacities as stockholders or trustees of stockholders have indicated that they intend to waive their respective rights of first refusal to purchase the Shares.  This may result in a delay of 60 days or more in the transfer of the Shares to SAG even if sufficient funds are raised and if terms can be agreed upon by SAG and the holders of the Shares. See Exhibit H, Stockholders Agreement among certain Shield stockholders.

The Managers anticipate SAG entering into a voting agreement with Thomas F. Sax similar to the form of voting agreement

attached hereto as Exhibit I which agreement will provide that Mr. Sax will vote the shares over which he has voting control as follows: (1) If SAG purchases the Notes or the Notes and Shares, then he will vote his shares and his proxies in favor of an increase in Shield's board size from three to five members and cooperate in the nomination and election of the following directors: Samuel Wm. Sax, Thomas F. Sax, William ("Mike") Weible, Bryan Zingg and James R. Donnelly or (2) if SAG purchases only Shares then he will vote to elect William ("Mike") Weible as the third director of Shield (with Samuel Wm. Sax and Walt Robb being the other two directors). It is anticipated that this voting agreement would be in effect for at least as long as the existing voting agreements are effective. It is likely that SAG would hold any Shield shares it acquires subject to the Stockholders Agreement a copy of which is attached hereto as Exhibit H. It is anticipated that this agreement will be amended or a new one would be entered into in similar form in order to address the size and composition of Shield's board going forward, assuming acquisition of the Notes and Shares or if Notes are not purchased then Shares representing at least 40% of Shield are purchased by SAG (pre conversion of Notes).

| | |
|---|---|
| Eligible Investors | Units will be sold only to "accredited investors" as defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended. Further, the Units will be sold only to such investors residing in states in which SAG has available to it or can easily and inexpensively, in the Managers' discretion, qualify for an exemption from registration. Prospective investors must have such knowledge and experience in financial and business matters such that he or it is capable of evaluating the risks and merits of an investment in SAG. The Managers reserve the right to reject any subscription in whole or in part for any reason in their discretion. |
| Risk Factors: | *Risks of the Offering:* All of the information included herein regarding Shield has been obtained through certain of the officers and directors of Shield. It is possible that such persons do not have access to all material agreements to which Shield is a party and which may be pertinent to an investment in SAG. No person has undertaken to perform due diligence on behalf of investors in SAG. Therefore, prospective investors should undertake their own due diligence or acquire Units with the understanding that full and complete information regarding Shield may not have been made available to them. This offering outline summarizes the terms of many lengthy and complex documents. Investors are urged to review the documents as well as this summary. Any conflict between this summary and the referenced agreements will be governed by the agreement terms. SAG may not be successful in |

acquiring any Notes or Shares and yet will incur the costs of formation of SAG, the preparation of the offering and the fees and costs associated with negotiating those proposed purchases. Even if SAG is successful in negotiating terms to purchase the Shares Shield or the other stockholders of Shield may not waive their rights of first refusal which may have the effect of SAG not acquiring some or all of the Shares as planned. The terms upon which the Notes and/or Shares may be acquired by SAG may not result in a favorable investment return to investors in SAG. Investors in SAG may lose all of their investment in SAG. Any investor in SAG should be prepared to lose his or its entire investment in SAG. There is no assurance that all of the risks of investing in SAG are set forth herein.

*Risks of Holding Notes.* There is no assurance that Shield will continue to be able to pay interest on the Notes or that it will ultimately be able to repay the Notes. If SAG acquires the Notes, the Notes are secured by a lien on Shield's assets but the lien is subordinate to the lien of subordinated to the senior lien of DPB, which lien is capped at $2,000,000. There is no assurance that Shield will be able to repay or refinance the DPB loan when it matures. If Shield is unable to do so it is unlikely that there would be sufficient collateral to repay DPB and for Shield to continue operations and/or repay the Notes. During the period of time that the DPB loan is outstanding the Notes may not be converted into shares without DPB's consent. There can be no assurance that DPB will provide such consent if it is required. The collateral securing the Notes is illiquid and may not be liquidated in a manner that is sufficient to repay the face value of the Notes or any unpaid interest thereon. To the extent that Shield's business is impacted as described under "Risks of Shield's Business" below, the same risks may also be risks of holding the Notes.

*Risks of Owning Shares.* The Shares are risky securities and represent an unsecured interest in an early stage company. If SAG acquires shares of Shield SAG will be a minority investor unless SAG acquires the Notes and sufficient Shares such that following a conversion of the Notes SAG is the majority stockholder of Shield. Except for certain limited matters set forth in the SAG operating agreement, a form of which is attached hereto as Exhibit J, investors in SAG will only own the shares indirectly and will have no ability to direct the Managers' direction of SAG. The Managers as such will have minimal ability to control Shield on a day-to-day basis. Ownership of any Shares (or as a result of conversion of the Notes) is an investment in Shield. To the extent that Shield's business is impacted as described under "Risks of Shield's

Business" below, the same risks may also be risks of holding Shares. Shield is limited in its ability to grow the business or to weather downturns in its business and to compete against better capitalized competitors as a result of its limited capital position.

*Risks of Acquiring Units.* Investors will be substantially passive investors in SAG and SAG will be controlled by its Managers. SAG will not have control over the actions or business of Shield on a day-to-day basis and thus will have limited influence over Shield's ability to succeed.

*Risks of Shield's Business.* Substantially all of Shield's sales are to governmental entities or agencies and thus its sales are subject to budgeting, appropriations and other processes which may result in extended sales and/or payment cycles. Shield is dependent upon a single supplier for one component of its covers. Any interruption in that supply for any reason would have a material adverse impact on Shield and SAG. Shield is dependent upon a limited number of suppliers for other components of its covers and on two sewing contractors for the manufacture of its covers. Any interruption in those supplies or provision of sewing services could have at least a short term material adverse effect on Shield and thus SAG. To the extent sales are to non-US purchasers the sales of Shield's covers are subject to export regulations. Due to such export controls the covers may or may not be sold to certain customers and such sales even if allowed may be delayed significantly, any or all of which could have a material adverse impact on Shield and thus SAG. Inability to repay and/or refinance the bank loan; inability to raise additional capital or debt financing, inability to sell its products, inability to manufacture product, inability to sell product profitably, inability to collect for product sold and shipped are all risks of Shield's business. Shield's business is exclusively the sale of licensed products. Should the license be terminated Shield would be unable to continue its business. Currently Shield is not aware of any direct competitors manufacturing corrosion inhibiting covers for military hardware or equipment. In general Shield's products compete against standard covers (without corrosion inhibiting properties) non-coatings and manual post corrosion maintenance. There is no assurance that additional, better capitalized competitors or competitors using new or different will not appear in the future.

Litigation against Shield     One former employee of Shield has filed suit against Shield and presently claims $125,000 in damages. Shield has tendered this claim to its insurer who has accepted the claim subject to a reservation of rights. A representative of a Shield shareholder is

also threatening litigation against Shield regarding a board seat. To the best of SAG's knowledge, Shield denies any wrongdoing and does not believe it has any material liability in any of these pending or threatened claims.

Capitalization of SAG | Subsequent to the completion of the capital raise, the Members will own 100% of SAG.

Distribution Priority: | Holders of Units will receive their pro rata distribution of interest payments on the Notes, if acquired. If the Shares are acquired, any distributions or proceeds thereof will be distributed to the investors in SAG pro rata. The Managers reserve the right to withhold from such distributions amounts necessary to pay SAG expenses.

Voting Rights: | The Members holding at least two-thirds of the outstanding Units shall have the right to approve and/or consent to the following items: election and removal of Managers; sale of Notes and/or Shares, sale of Shield, sale and/or liquidation of SAG (other than a liquidation following sale of the Notes and/or Shares), election of representative(s) to Shield's board of directors. Day-to-day management of SAG shall be in the hands of the Managers. The Managers must agree on SAG's exercise of its rights under the Investor Rights Agreement.

Information Rights: | The holders of Units shall be entitled to obtain from the Managers during ordinary business hours and with reasonable prior written notice to the Manager (a) to inspect SAG's books and records; and (b) to discuss SAG's affairs with its officers. The Manager will only have such information regarding Shield as the Manager receives from Shield's management.

Transfer Limitations: | The Units may not be transferred to any other person (except for certain affiliate, family and estate planning transfers) without the express written consent of a Manager. No transfers (other than by operation of law) will be permitted for the first 12 months after SAG commences operations.

Placement Fees: | There will be no fees to the Managers for organizing the Offering. The Managers shall be entitled to reimbursement from the gross proceeds of the offering for any out-of-pocket expense incurred in connection with forming SAG, organizing the offering and negotiating the purchases of Notes and Shares as proposed herein, including formation of the entity and related legal an/or accounting fees and costs.

Required Documentation:      In addition to providing a certified check or wire transfer to SAG in the desired subscription amount, an Investor must sign a subscription agreement, copies of which are available from SAG. Once the subscription is accepted by SAG on and after the date subscriptions for the minimum number of Units have been accepted by SAG, an Investor's signature on the subscription agreement shall be deemed to be a signature on SAG's operating agreement. See Exhibit K which is a copy of the Subscription Agreement for Units.

Closing Date:      Investors' subscriptions must be funded no later than June 18, 2010 if paid by check and June 25, 2010 if paid by wire which dates may be extended in the Managers' discretion. See page 6 of the Subscription Agreement (Exhibit K) for additional information.

**ATTENTION FLORIDA INVESTORS ONLY: IN THE EVENT THAT FIVE (5) OR MORE FLORIDA RESIDENTS SUBSCRIBE FOR THE SECURITIES OFFERED HEREBY THEN FLORIDA RESIDENTS MAY VOID THEIR SUBSCRIPTIONS BY NOTIFYING THE COMPANY WITHIN THREE (3) DAYS OF THE PURCHASE OF THE SECURITIES AS REQUIRED BY SECTION 517.061(11)(A)5 OF THE FLORIDA STATUTES.**

**Index of Exhibits**

| Exhibit | |
|---|---|
| A | Shield Audited Financial Statements |
| B | Intellectual Property License |
| | 1.     Assignment and Assumption Agreement |
| | 2.     Creare Waiver Letter |
| C | Form of Note |
| D | Note Purchase Agreement |
| E | First Amendment to Note Purchase Agreement |
| F | Note Conversion Table |
| G | Investor Rights Agreement |
| H | Stockholders Agreement |
| I | Voting Agreement |
| J | Operating Agreement |
| K | Subscription Agreement |

517697v12

12

**Exhibit A**
**Shield Audited Financial Statements**

**Exhibit B**
**Intellectual Property License**

**Assignment of License to Shield**

**Waiver Letter regarding breach of license
provided at time of assignment of license to Shield**

**Exhibit C**
**Form of Note**

**Exhibit D**
**Note Purchase Agreement**

**Exhibit E**
**First Amendment to Note Purchase Agreement**

## Exhibit F
## Note Conversion Table

As of May 15, 2010, Shield has 5500 shares outstanding and has granted options to purchase 745 shares that remain in effect and are fully vested and may be exercised in accordance with the terms of such grants and 255 reserved for issuance under the option plan which have not been granted to any participant.

The assumptions underlying the following table are that the Notes when purchased will have no accrued and unpaid interest (principal only and accruing interest to the benefit of SAG only on and after the date of acquisition). We have further assumed that the interest will be paid to SAG going forward in cash at least annually. Such payment is not required under the terms of the Notes. .

The Unfunded Commitment is $1,750,000 and as such the holder of the GEPT Note is entitled to convert each $250,000 of that into 1.25% of Shield on a fully diluted basis at the time of conversion.

The following table shows the number and percentage of shares of Shield common stock for which the $1,550,000 of Notes would be convertible at the specified dates assuming no additional shares are issued or options granted or terminated.

| Aggregate Principal Amount of Notes | Accrued Interest on Notes | Number of Conversion Shares | Percentage of Note Conversion Shares | Unfunded Commitment | Number of Conversion Shares from UC | Percentage of Shares from UC Conversion | Total Percentage of Shares from Conversion |
|---|---|---|---|---|---|---|---|
| $1,550,000 | $0* | 1330 | 15.5000% | $1,750,000 | 751 | 8.75% | 24.25% |

**Exhibit G**
**Investor Rights Agreement**

**Exhibit H**
**Stockholders Agreement**

**Exhibit I**
**Voting Agreement**

**Exhibit J**
**Operating Agreement**

**Exhibit K**
**Subscription Agreement**